Appellant is splitting time so please watch the clock. Okay you may begin. May it please the court this is Eric Moltoff on behalf of Appellant Hoyos and I'm going to speak for up to 15 minutes on the Batson issue and co-counsel Mr. Adams is going to speak for up to 15 minutes on trial issues. So let's start with the and that's whether the California Supreme Court made an unreasonable application of controlling United States Supreme Court law when it affirmed the denial of the Batson motion in this case. So in 2005 Johnson v. California held that the California Supreme Court had imposed an unconstitutionally high burden on an objector in a Batson situation to establish a prima facie case and in the course of that ruling the Supreme Court specifically condemned judicial reliance on colorable reasons on plausible reasons as a substitute for getting actual reasons from the prosecutor. So what language are you relying on in Johnson? Yes. The question was what language are you relying on sir? Oh what language? The language that's to the effect that judicial speculation is not to be relied on in this kind of determination. Rather it's to look at the facts. This language is found at approximately page 173 of Johnson v. California at 545 U.S. So in the aftermath of Johnson the California Supreme Court had this case and a number of other cases in the pipeline that had Batson claims in which they were adjudicated under the pre-existing and unconstitutional standard. The California Supreme Court adopted a consistent appellate approach of rejecting prima facie claims from pre-Johnson cases with the statement that was so often repeated it's virtually a mantra. We will affirm the ruling when the record suggests grounds upon which the prosecutor might reasonably have challenged the juror in question. And where in Johnson does it reject that formulation? Is there any language in Johnson that specifically says that's permissible? Johnson criticizes and condemns that practice. Okay that's that's like a reasonably prudent prosecutor standard. I didn't see anything in Johnson specifically addressing that. Johnson struck down the more likely than not standard. My question is closely related. I don't want to spend a lot of time on this but you cited page 173. It seems to me at 172 the court said the Batson framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. They cite to that advocated that approach. Yes. I am not sure what else you're relying on and I think Judge Ikuda's questions well taken. I'm assuming that's the passage you're relying on. Okay I have the case in front of me and I'm scanning for the Johnson recommends going forward to step 2 but doesn't say that you can't make a decision at step 1 and I didn't see anything about step 1 that says you can't rely on the language that the California Supreme Court relied on. So that's the basis of my question. Okay now I'm looking at page 172 the language it says the inherent uncertainty present in inquiries of counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by a simple question. So that suggests going on to step 2 of the Batson inquiry but I didn't read Johnson as saying you can never make a decision at step 1. Well the Superior Court and the Supreme Court are supposed to make decisions at step 1 based on whether there is evidence in the record that supports an inference of discrimination. Right an unanswered inference and it's not a heavy burden but you do have to clear step 1. So could you give us your best shot at how there was an inference of discrimination at step 1? Yes so there's several prongs to this. The first one is the contextual factor that the defendants were Hispanic and they were accused of killing a white couple. Johnson v. California recognized that interracial aspect of the of the prosecution to be an important factor in in the assessment. I think that's right I'll give you that and then could you go on I just want to make the very best use of your time sir. So we have these jurors of the same race as the defendant who were the prosecutor used strikes to remove them and then so we got that what else have you got at step 1 please? At step 1 all three of these struck jurors were respectable solid citizens by any standard gainfully employed long standing residents of San Diego County. In other words demographically excellent candidates to be jurors. Are you relying on a statistical analysis sir? Yes. Okay what's the size of the overall veneer please what was the size of the overall veneer? In other words three out of how many do we know that here? Three out of that's it there were three. No no no. And they were all struck. Well one of them of both parties I think or or tried to the challenge I should say and they was was was challenged by both parties correct? So your honor that was earlier this earlier aspect of the case but but two of the defense counsel joined in in the Batson motion. I thought the defense counsel and the prosecutor both wanted to strike MA for cause because of her English usage issue. Alvarado that's true your honor but counsel for Alvarado did not want to challenge her showing that that was kind of a judgment call and then further along in the jury proceedings when the prosecutor had struck three Hispanic jurors counsel for Oyo's joined in the Batson-Wheeler. Well there's two different aspects of the The defense counsel's burden is to say what raises the inference of bias? So far I've heard that three of the five Hispanic jurors were struck and that they were accused of killing white people. The other side which will we will certainly ask the other side is what evidence disputed whatever inference of bias but I'd like to give you a chance to answer Judge Christian's question what other evidence raises an inference of bias? Yes number three there were three white jurors who were equally and indistinguishably ambivalent about the death penalty as were Ms. Hernandez and Ms. Madoweno. Counsel on that point when I compare I'm setting aside MA right and then I looked at the the responses of the two jurors who were seated sorry that you identified who are seated there's the idea you identified about four of them that you that you said were equally ambivalent and it seems to me this is a tough argument for you so I would like you to tell me which one is the strongest my summary is that those folks expressed reverence recognition of the severity of a death penalty but all said they thought it would be they could do it although it would be difficult and that the two who were excused had one had a religious reason one you know much wobblier if I choose to use my word could you really focus on this point and tell me what you think I'm missing there? I think you're missing your honor that both Ms. H and Ms. M answered question 63 the open-ended question what are your feelings about the death penalty? Ms. H said question 63 I believe in the death penalty. Ms. M said it's a punishment that should be done now there were some qualifications to that but there these two jurors had a basically a pro-death penalty stance not an anti-death penalty stance the three white jurors who were struck one said it should be reserved for the crime of answering a question about what should when it should be automatically imposed I think isn't that fair? Well anyway the record will speak for itself on that but okay yes go right ahead. The second juror said it was an enormous enormous undertaking that filled her with trepidation now the prosecutor did not voir dire her about this trepidation whether it would impede her liberations or anything and the absence of voir dire is an indication recognized in Miller L and other cases that it's not a clear and and obvious reason for a prosecutor to strike the person and the third white juror said well it's supposed to be reserved for the worst of the worst so there's no way to distinguish between Ms. M and Ms. H versus the three white jurors who sat in terms of their attitudes toward the death penalty all of them displayed ambivalence and all of them said that if push came to shove they could follow the judge's instructions so the comparative analysis shows that the reason the prosecutor used to strike Ms. M and Ms. H was not so clear that any reasonable prosecutor would have used it would have relied on it so in summary we have the context of the case we have the clear-cutting of all Hispanic female jurors we have white jurors who are indistinguishable from two of those Hispanic jurors no either no voir dire or cursory voir dire as to the as the factors that the California Supreme Court relied on that is enough to establish a prima facie case under Johnson v. California and I would like to take back two minutes and 20 seconds and hand to my to my esteemed colleague but I didn't so I'm going to turn it over to him right now okay thank you thank you good morning your honors I'm Mark Adams and I also represent the appellant Mr. Jaime Hoyos. California failed to fairly and reasonably resolve the many errors leading to the conviction and the death sentence in Mr. Hoyos wanted to testify at his trial he wanted to explain that he did not kill Mary and Dan Magoon and that he and his co-defendant arrived at the Magoon house after the Magoons had been killed. Mr. Hoyos decision not to testify at trial was tainted by his his own lawyers who did not listen to him by the government prosecutors who withheld the Jimenez Brady material until the verdicts were filed to sever the trials in the first instance and then denied Mr. Hoyos motion for a new trial based on late disclosure of the Brady material. Mr. Hoyos lawyers failed to meaningfully investigate every aspect of the case and the witnesses against him. They unreasonably halted the defense investigation into third-party actors and an investigation of the Magoons and their criminal enterprise which was importing narcotics into the United States and exporting tactical gear and weapons into Mexico for Mexican cartels while operating a methamphetamine lab in Ensenada. It was also suspected that Dan Magoon was cooperating with the Drug Enforcement Administration which combined with a recent lost load of marijuana, a significant load of marijuana would easily be reason enough for the notoriously violent Tijuana cartel to kill the Magoons and steal what was reported to be as much as $250,000 stashed in a toolbox in the Magoons garage. The district court if I'm remembering correctly said well there was evidence of motive and even of opportunity for these third parties but there wasn't any evidence actually linking them to the crime and so therefore it wouldn't have been admissible under California evidentiary law anyway. Do you want to explain why that's not correct and what the linkage, what the evidence is linking? The failure is, excuse me I hate to interrupt you, the failure is that of Mr. Hoyos lawyers to investigate back in 1992 and 1993 when the trail was fresh. So they did testify that they did extensive investigation, they even sent their investigator down to try to follow up on it. So there was evidence in the record of investigation so are you saying it wasn't enough and how how would that be evidence in this record? It was incomplete and they then they halted that investigation into those third parties and they seized upon a different trial strategy. But didn't they halt it for, you have to show, you know these facts I don't want to take your time but they had reasons for halting so again I'm trying to figure out. I don't think they did have a reason to stop the investigation. There's no good tactical reason not to look into the actions of this violent Tijuana cartel. Members of the cartel, senior members including this Efrain Perez was seen at the Muglun house in the week leading up to the killings in May of 1992. Yes I understand what I'm trying to get at is it has to be within their reach, it has to be something they could do safely. Could you be specific about what exactly you think they didn't do? They didn't go into Mexico and and significantly investigate. They didn't find David Luna. I thought their investigator did go into Mexico. Pickering. We have many investigators who go into Mexico routinely. The investigator who worked with. What specifically should they have done I guess is the question. Well they should have tracked down who can identify Efrain Perez as having been at the Muglun house in the week before and exactly what he was doing there. He was known to be a person who was organizing the trans shipment of narcotics into the United States along that Tecate Plaza. But you seem to be arguing, forgive me for interrupting sir, but just to put a point in this so you have an opportunity to respond. You seem to be arguing that since they were unable to identify that information, their performance, this is a different part of that I'm having a hard time with. Yes, their performance. Unsuccessful, but that doesn't mean that they were ineffective. Well I don't think they worked at it with any diligence at all. And there were a number of actors, as your honor points out, there were a number of actors who had motive and opportunity and who had been seen at the Muglun house in recent days leading up to the killing. As well as Muglun's statements to his compatriot, Jimmy Johnson, that he was in fear for his life. He was in trouble with these cartels. He was in debt to the people in Mexico. This is a very violent time in that border area. Tecate is a small town between Tijuana and Mexicali. The Tijuana cartel, the Arellano Felix organization, was trying to cement their control over the entire, what they call, plaza between San Diego and Mexicali. And a choke point there was the Tecate plaza was Don Gustavo Alvarado, who was related to the co-defendant, Mr. Alvarado. Is there today evidence of a linkage? I mean what you're saying is the story that Jimmy Johnson testified to and some elaboration of that, but the concern of the district court was that there wasn't actually any evidence linking any of these third party players to the crime scene itself or to the crime. And so as we talk here today, is there evidence that you have that could have been presented or could be presented in a retrial? The problem here was that the investigation needed to happen at the time. Is that a no? It's a no with an explanation. Yes, Your Honor. Okay, thank you. Because the investigation needed to happen at the time when the trail was fresh. When investigators could get into the crime scene and actually do their own independent defense investigation. They didn't do that. They didn't do that at all. And when appellate counsel looked into it in 2006, they found more leads once they learned of the Brady material concerning David Luna, which was not turned over. This is the identifying information for David Luna, who Jimmy Johnson said was responsible for the killings. And so they let the trail go cold. And that's inexcusable, particularly in a death penalty case, for counsel to let the trail go cold. Did appellate counsel follow up on the David Luna? They did. And what did they find? He was able to find where David Luna's house was, and it matched up with what Jimmy Johnson had said. But they weren't able to link him to the Magoon scene. And I think a lot of that has to do with the crime scene evidence being contaminated and lost, essentially. Lost to time, if you will. Mr. Hoyos' lawyers failed to present exculpatory evidence based on the physical evidence at the crime scene. They allowed blood evidence, which would have exculpated Mr. Hoyos, to come in as uncontradicted. It was unreasonable for the California Supreme Court to deny this claim for lack of prejudice, because the prosecutor used that uncontradicted crime scene evidence to argue, quote, it's a very rare man that can beat and torture and shoot a woman like Mr. Hoyos did. And he then counted out the number of blows struck, according to his analysis of the crime scene evidence, by pounding on the table, beating her head and beating her body and cutting her. So the district court said that the defense counsel had hired a blood spatter expert, had used it to cross-examine the prosecutor's blood spatter expert, and that that was a permissible approach. What's your response to that? It fell woefully short, because had he put on someone like Nick Crawford, you have the Crawford Declaration in this record at 6 volume of Excerpt of Records 1460, and in that he assigns 11 errors that were committed during the crime scene investigation. And the way this argument came out by counsel for the government was that he argued that he has no regard for human life and should be put to death because of this beating. Well, if he had done that in the way that the counsel suggested, he would have been covered in blood. And the shooting happened at close range, relatively close range, and so there would have been blood or other body fluids blown back on the shooter in that circumstance. Hoyos was arrested within an hour of the time that it is thought that the crime occurred, and he had no evidence like that on him. There was one speck of blood found after a detailed analysis, and that turned out to be contaminated. But in that way, the blood spatter evidence helped your client. Right, but that was never presented to the trial court. It wasn't put on. It wasn't emphasized. Was what you're objecting to in that way helpful to your client? I'm sorry. I think you've answered the question. I'm sorry. Well, they didn't effectively put on the evidence that they could have put on that would have shown that Jaime Hoyos wasn't there when the Magoons were killed. Jaime Hoyos and his co-defendant did arrive later, but they... Is the strongest evidence, forgive me for interrupting, is the strongest evidence you have of that, the fact that your client only had the, you know, very minimal amount of blood on his jeans? It was one little speck. That's it. It's just a yes or no. I'm trying to figure out if there's something else. There was no other blood evidence on him. Right. So is that the strongest evidence you have, that someone else committed this crime? Yes. Okay. I'm sorry. Was defense counsel able to present at trial that the splatter should have been more, that there should have been more blood on his clothes? I don't know. I don't know whether or not they did, Your Honor. I know they should have. They should have put on an independent expert to lay this argument out before the jury so that the jury would have this to consider, at least in analyzing whether or not there's a reasonable doubt that Mr. Hoyos and his co-defendant were there. So, and they, it just doesn't, it defies logic that they didn't call either Taylor, the DNA expert, or Fox, the criminologist, and even trial counsel Herrera in his declaration pointed out that he didn't know why that decision was made, why there was no witness called. And in that sense, the California Supreme Court and the district court both found that the prosecution relied on detailed crime scene evidence to establish its case. That was the heart of the case against Mr. Hoyos, and his lawyers did nothing effectively to rebut that case. His lawyers failed him at every turn. Ignoring the rich sources of information about several third-party actors and evidence pointing to real killers, Mr. Hoyos' lawyers elected a ridiculous and self-defeating trial strategy, admitting the killing of Dan McGoon, but doing absolutely nothing to explain the killing of Mary McGoon, which is what resulted in the death sentence for Mr. Hoyos. Mr. Hoyos' lawyers prevailed upon him to not testify, and they did so exclusively because they did not know about the Jimenez-Brady material and the recantation of jail witness George Jimenez. One question I had about that, you said at the beginning of your presentation that he would have testified that he arrived after the deaths of the two individuals. I don't see why that anything in the Jimenez testimony or in the Weil report would have stopped him from testifying that. It wasn't contrary to Mr. Alvarado's interests, and of course, Mr. Hoyos couldn't be impeached by Jimenez's testimony. So how does that affect the decision to testify? I didn't understand it. Yes, Your Honor. Thank you. Mr. Hoyos and his co-defendant, Jorge Alvarado, they were brothers-in-law. They elected a joint defense strategy because they both knew that if Mr. Alvarado took the witness stand and Jimenez came on to impeach him, it would be devastating. But why couldn't Hoyos take the stand and come up and testify that the two of them had arrived after the individuals were murdered, and he could not be impeached by Jimenez's testimony, so it would have been an improvement for Mr. Alvarado as well. I understand, Your Honor, and that would have been an interesting strategy, but these parties decided among themselves, because Alvarado was insistent on his testifying if Hoyos testified because he wanted to explain what happened too. Okay, so it was sort of an irrational strategy, but how does that affect the analysis here, that there was any error in the Jimenez-Weill report issue? Well, California's Supreme Court and the District Court, indeed, also did not take into account the importance of this piece of information to Mr. Hoyos' decision to not testify.  He was prevailed upon by the lawyers. They insisted that he not testify out of concern that the Jimenez statement would come in, because if Hoyos testified, Alvarado was going to testify. That was the landscape on the ground between those parties at the time of that trial. And they withheld the information about David Luna, which would have helped the defense attorneys find Mr. Luna at the time. The Sheriff's Department failed to produce Jimenez's medical records, which counsel should have known about, because in Jimenez's pre-sentence report, there was information about his multiple brain injuries and the medication that he was taking, and a simple search would reveal that that medication affects one's memory. The trial court should have severed these trials because there was no way to sanitize that statement. You're the ones that capped that little kid, and then Alvarado laughs and says, yeah, that was us. It was virtually impossible to meaningfully sanitize that so that if Alvarado testified, it would come in, and it would be clear because they were both there in the room. Do you want to save some time for rebuttal for you and your co-counsel? Okay, but I want to make one last point, and that is that Mr. Hoyos' lawyers violated the Sixth Amendment by not paying attention to Mr. Hoyos about what happened on May 26th, not listening to him about the fundamental decision to admit the killing of Dan Magoon, by not building and supervising a team to investigate and uncover the many pieces of exculpatory evidence within their grasp, not independently investigating every aspect of the case, including an investigation of the Magoons, overriding Mr. Hoyos' clearly expressed protestations of innocence as to both killings and then doing a grossly inferior job of presenting the unwanted concession defense. Mr. Hoyos' lawyers failed him time and time again, and with this team of lawyers, he didn't have a chance. Thank you. Okay, we'll hear from the government. Good morning, Your Honors. Anthony DaSilva, Deputy Attorney General for Appellee and Respondent Warren Davis. May it please the Court. The District Court correctly concluded that the California Supreme Court denied the Batson Step 1 challenge, and that denial was not contrary to or in a reasonable application of established United States Supreme Court authority and was not in a reasonable determination of the facts in light of the evidence presented to the State Court. As to the size of the veneer, there's a question. The veneer had 42 persons in the veneer. That was one of the things that the trial court considered, and the initial challenge to the trial court was just to three Hispanic jurors out of this veneer of 42. The court was able to see that there was one unchallenged perspective Hispanic juror, one unchallenged perspective alternate juror, and in addition to just looking at only the objection to the three, reviewed the record to see whether it showed any inference of discrimination. The review of the record actually refuted any inference of discrimination. Did you read that as the District Court doing a comparative journal analysis at Step 1? The District Court did, Your Honor. That was the only time that it was requested. It's not a trick question. Is that how you read that? Is that how you interpret the record? I'm sorry. Is that how you interpret the record? Yes, that the comparative analysis was only requested on federal habeas corpus. I don't think that was my question. I'm sorry. My question is, do you read the District Court to have engaged in a comparative juror analysis at Step 1? Your Honor, I think it did, given the request that was made by— Again, it's just not a trick question. I'm sorry, yes. Thank you. Could I turn your attention for a moment to the California Supreme Court's formulation of the Step 1 standard where it said what I've been calling the reasonably prudent prosecutor standard. The California Supreme Court said, where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question. In our opinion, in Curry v. McDowell, we said that that standard is erroneous and that the principle that that standard was erroneous was clearly established for EDPA purposes in 2005 by the Supreme Court's decision in Johnson v. California. So, according to us, not according to the Supreme Court, but according to us, the Supreme Court has said that the California Supreme Court applied the wrong rule of law. What's your response to that? Your Honor, in this case, the California did not do that. The California Supreme Court independently reviewed the record, looking at all of the circumstances instead of looking whether a reasonable prosecutor would have made such an objection. And so, based on that independent review and not deferring to the trial court, the California Supreme Court undertook its analysis, and that was the first time that a statistical analysis. Counsel, it involves speculation about what the prosecutor might have done, might have thought. That is not what Batson is about. Johnson tells us that really clearly. I think there's some real hurdles to get over step one, but it seems to me that the answer to Judge Akuta's question is when you're sidestepping. And it's important, at least from my notes, so could we back up and talk about that? It seems to me that the California Supreme Court was engaging in speculation about what the prosecutor's motives might have been.  I do, Your Honor. I look at it as the California Supreme Court was looking at the record to see whether it refuted any claim of discrimination, looking at what the answers were. So there was no speculation. It was looking at the record to see if it refuted any claim of discrimination, and that's why it looked at the record to see what would have been the reasons, as opposed to trying to make up or come up with reasons why the prosecutor might have challenged. Well, how do you get over the hurdle that the Supreme Court said that it will? We will affirm the ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question. I think that is inartful, Your Honor. I think it was an inartful way of putting it, and the review of the record was to see, again, whether it confirmed or refuted the claim that the bats had challenged. Well, first, do you agree that that's an erroneous articulation of bats in Step 1 law? It would be an erroneous, yes, Your Honor. It would be an erroneous as to Step 1, and this is more of a Step 3, Step 2, Step 3 analysis, and I think it was inartful. So you're saying even though they said it, they didn't actually apply that standard? I don't believe they applied that standard, and the district court didn't believe that they applied that standard. So I'm concerned about that because if the California Supreme Court doesn't say that just one time, it then goes on to say, in any event, the record discloses race-neutral grounds for the prosecutor's preemptory challenges. And then looking at Juror L.H., it says this equivocal statement doesn't undercut the race-neutral basis for a prosecutor's decision and says something similar about Y.M. The record suggests the prosecutor had reason for concern. So it appears that throughout, the California Supreme Court is applying its standard as, does the record disclose race-neutral grounds for the prosecutor's challenges, as opposed to trying to determine what the prosecutor really thought or other bases for dispelling the inference of bias. So how can we, based on the language choices that the California Supreme Court used, how can we say it wasn't applying this principle? Your Honor, again, it was because it looked at an independent review and didn't just rely on it. But I believe if it was the wrong standard, and I don't think it was, but if it was, Your Honor, then the district court then independently reviewed the challenge, and it would have affected maybe any deference that the district court made. If we were to decide that that part of the court's reasoning was error, they identified the right case, Johnson, which did two things, right? It changed the standard of review, but it also said don't lean in and speculate about what the prosecutor was thinking. That's my paraphrase, of course. If we think that that was error, there's still a step one burden here. And so what would your argument be at that point? Well, the step one burden still, given the size of the veneer, given the statistical challenge being de minimis in this case, the prosecutor had not exercised all of the peremptory challenges. The court looked at significantly the fact that there were two Hispanic jurors, one on the panel and one as a prospective juror. And based on all of those circumstances and looking at the tenor of the prosecutor's questions and comments during voir dire, refuted any inference of discrimination. Well, refuted. Okay, so at step one, we're looking to see whether there's an inference of discrimination, which if unrefuted, you know, might indicate a problem. So I'm just trying to figure out what your best shot is at step one, and you said you think the statistical analysis was inadequate or does not raise an inference of discrimination. Is that right? Yes, Your Honor. At trial, again, they only pointed out to three Hispanic jurors. The claim on direct appeal was three out of four Hispanic jurors in a veneer of 42. Right. And so statistically, the court didn't see that as per se raising an inference of discrimination given the de minimis nature. Did I interrupt you? I'm sorry. No, I just wondered, how is that possible? It's only 60%, three of five Hispanic jurors. How is that not at least a statistical? Well, Your Honor, if you look at the peremptories, all of them that were made on the veneer, and so the actual challenge was three of 16 prospective Hispanic jurors. So that would be about 18.75%. Wait, there were 16 total Hispanic jurors? No, no. The challenges were there were three. Oh, three of the peremptories were only used. Of the peremptories were only three used out of 16. And then 81%, 13 of 42 were non-Hispanic jurors in the peremptories, and there was one Hispanic juror that was selected and one alternate that was selected that remained unchallenged. We've indicated earlier when questioning opposing counsel that MA is someone who was challenged for cause by both parties, but I'm interested if you could help us out with the other two jurors. They were challenged here two different ways, and in particular we have said a comparative journal analysis can be used at step one under certain circumstances. And so there's an argument that if one compares their answers and their misgivings, that those two expressed, to jurors who were seated, that that is indicative of discrimination. Could you please run through your response to that? Yes, Your Honor. As to alternate YM, again, there was that religious reservation that was fairly strong. And as to LH, there was a strong statement that she would tend to side with life in prison rather than the death penalty. And again- So hold on. So right there, forgive me for interrupting, but to break this down, you're reading now from the transcript of what they said when they were questioned as opposed to what they wrote on the jury questionnaire. Is that right? Yes, Your Honor. Okay. So on the jury questionnaire, they responded, I think, the way opposing counsel mentioned and didn't, my read, so that you both have a chance to respond, is that there they didn't express reservations. But upon questioning in the courtroom, they did. Is that right? That's correct, Your Honor. Okay. And one of them expressed religious reservations, and the other one expressed, as you were saying? A strong preference for life in prison over the death penalty. How do those responses compare to the other folks who were seated, please? They compare stronger as the district court looked at. And again, we know that there are fine judgment calls that have to be made by both the prosecution and the defense as to whether a juror may or may not. Yes, but we take facts and challenges very, very seriously. So if you could just humor me and walk through the analysis, please. How do they compare with the folks that were seated? They were much stronger and more direct than the people who were seated, who, again, expressed some reservation but not as strong as the jurors that were identified. Do you think they expressed reservations about the folks who were seated? Do you think they expressed reservations about the ability or willingness to impose the death penalty? They expressed reservations on the difficulty in maybe making that decision but not in imposing it as we had with L.H. or as strongly with the religious reservation as we had with YM, the alternate juror. Is there anything else we should be considering at Step 1? I believe that is the totality of your honors in Step 1. Are you aware of any case where we found that the state court made an error in applying the law or in articulating the Batson law but nevertheless upheld at we upheld on de novo review at Step 1 that there was that the inference of bias was refuted? Your Honor, not at this point. I'm not aware, and I'm not aware of any Supreme Court case that says you can't. There's none that says you can't, but you're not aware of any circuit court? How about out of circuit? No, Your Honor, I am not. Okay. Thank you. Question. Does it make a difference? If we read Curry to say that the court can't speculate to the prosecutor's reasons, does it make a difference that for MA and YM, the prosecutor did lodge a forecast challenge and so we're not speculating there because the prosecutor articulated the reason for the challenge? And then how does that leave us with L.H., where we don't know why the prosecutor challenged? With L.H., Your Honor, it is clear as to MA and YM, but as to L.H., and you look at the tenor and the responses that were made, and L.H. even stated that she would have difficulty sitting on a jury that might impose the death penalty, and that was clearly stated on Wadier as well. So you're saying it's so obvious with L.H. that we don't have to speculate as to what the prosecutor's reason is? Yes, Your Honor. So on YM, I also note that the trial court made a factual finding that YM had strong feelings against the death penalty, or at least that's what the California Supreme Court said. And then the California Supreme Court said that L.H. was equivocal or biased about the death penalty. Was there any trial court finding about L.H., anything in the record as to L.H.'s view of the death penalty? The court stated that L.H. would tend to decide with life imprisonment rather than imposing the death penalty. Okay. Thank you. Your Honor, I think based on the circumstances, the district court correctly found that the California Supreme Court rejected the claim that appellant had made a Batson Step 1 challenge. Regarding the different trial errors that were brought up, first of all, the prosecutors did not intentionally withhold the Wilde Report. It was found that it was negligence at best, and in any event, it was not Brady materiality. There was no Brady materiality in that Wilde Report as to appellants. Brady doesn't require a showing of intentional misconduct, and you don't mean to be suggesting that, right? No. So you're really relying on pronged immateriality? Yes, pronged immateriality. There was no Brady materiality in that report as to Mr. Oyo's and in his decision to testify. As far as the third-party claims that there was a failure to investigate, there's evidence in the record, especially that was presented on State Habeas Corpus, that the defense made many efforts, including having co-counsel and investigators look into third-party and did extensive search, trying to find any potential third-party, but there was nothing that they looked at that directly linked any third-party to the murder of the victims on the night that they occurred. Could you talk about the blood spatter evidence? Yes, Your Honor. The blood spatter evidence was contradicted or attempted to be contradicted in many respects during cross-examination. So the defense did consult with a criminalist and a DNA expert, and they were able to argue that given the amount of blood spatter and the fact that Oyo's appellant didn't have any injuries and not much blood on him, that's how they refuted and minimized. The jury heard that argument. If he had done it, he should have had more blood on his jeans or on him. On him, yes. The jury heard that argument. And the jury heard many other arguments regarding the evidence that appellant said was omitted or should have been investigated. Could I go back to the Brady issue for a moment? You said that the David Lunay information was not material, I guess, the identification. The Weill report, though, the California Supreme Court seemed to be considering it as to whether it had an effect on Oyo's decision to testify as opposed to whether it had an effect on the outcome of the trial. And so looking at whether it had an effect on the decision to testify, the opposing counsel says, well, it did because of this joint defense strategy. How do you respond to that argument? Your Honor, the joint defense, the both or neither strategy, is a calculus, maybe that Mr. Oyo's took into account as far as whether or not to testify. But among many other considerations, including potentially testifying and being impeached with strong evidence that put him inside the Magoon or the victim's home on the night of the murder and put him a lot closer, committing the murder of Mary Magoon. And so that was another consideration among many others, whether or not to testify. What evidence would there have been that would have put him in the home, as you put it? Well, Your Honor, we had his blood on the— I guess I should have asked what evidence, what additional evidence. How would it have changed? Because the jury heard the evidence about his genes, the blood on his genes. Yes? Yes. Okay. And then the jury heard about all the other evidence about the blood on the air rifle that— Okay, so I've confused things, and I didn't mean to. In response to Judge Ikuda's question, right, which is if there had been, if he had testified, then you're saying that he would have let himself in for cross-examination for other— I understood you to be saying other evidence that put him in the home. What is that other evidence that the jury did not otherwise hear? That's the evidence, Your Honor, that the jury heard that he would have been subjected to being cross-examined on. I am not following your answer. The evidence of his blood on the air rifle as well as Mary Magoon's blood. Did the jury hear that evidence anyway? Yes, the jury heard that evidence. Okay, you've answered it then. Thank you. So you're saying that it would have been, if he had taken the stand, he would have been cross-examined on that evidence. But is there any evidence that the jury didn't hear that would come in if he had taken the stand? No, Your Honor, I don't believe so. So what's the downside? That's what I understood the question to be. The downside to testifying would have been, again, possibly depending on what he testified to, then there would have been downside not to him, but downside to Mr. Alvarado. So if he had raised his theory as opposing counsel suggested, his theory was that they arrived at the house after the murders had already occurred. What was the downside to anyone for him taking the stand and raising that? Was there anything? Because the Jimenez testimony couldn't come in, as I understand it, just to impeach him. So what was the downside then? The downside would have been exactly the fact that he would have been confronted with the testimony, with the blood evidence, the physical evidence, the fact that he had the money that was missing from the wallet. So he would have just been confronted with evidence the jury was going to hear otherwise, but he'd have to answer directly in front of the jury? Is that the idea? He would have to answer directly in front of the jury. And, Your Honor, he also could be then impeached or cross-examined with his lengthy criminal history, his history, long history of drug dealing. The arrests in Mexico and whatnot, that could have been. The arrests in Mexico would not have come in, Your Honor, but his arrests in the United States, there were five. Why would the arrests in Mexico not have come in? Well, they may not have come in because of, I'm sorry, the arrests in Mexico would have come in in the guilt phase, yes. It seems to me that's the only downside, and I'm not minimizing it, but if he had taken the stand, the evidence the jury would have heard that they didn't otherwise hear is his prior criminal history. But, again, this is not a trick question. If I'm overlooking something, I want you to tell me. No, that's correct, Your Honor. It would be that lengthy criminal history and his involvement, longstanding involvement in drug dealing. Did his criminal history involve violent crimes? His criminal history involved drug dealing. It involved burglary. It involved nothing. Get on that if I can, Your Honor. It was a robbery, jewelry theft, forgery, trafficking of narcotics. Thank you. Is your argument that the Jimenez exculpatory information was not material because the but-for-cause of him not testifying was the joint defense agreement, and so therefore it's irrelevant? Yes, Your Honor. So the blood evidence was contradicted, and as far as the third-party evidence, it was investigated. There was nothing that connected anyone, any third party, to the murder of the victims on that night, even though it was investigated. And, Your Honor, unless this Court has any questions, we're willing to submit on the briefing. Apparently not. Thank you. Thank you, Your Honor. Okay, I think there was a minute left, but we'll give each of you a minute for rebuttal. Thank you, Your Honor. Thank you, Your Honor. In the course of the Eppley's presentation, the Court pointed out or referred to the for-cause challenges made by the prosecutor against Juror M.A. and Juror M. That actually weighs in favor of an inference of discrimination. For a prosecutor who wanted to get rid of all of the Hispanic female jurors, there was no downside to making a for-cause challenge, because if it prevailed for whatever reason, the prosecutor would have saved a peremptory challenge. So the fact that there were these two challenges against Hispanic female jurors and no for-cause challenges against the white jurors who expressed death penalty objections equal and indistinguishable from the struck Hispanic jurors supports an inference of discrimination. The last... Okay, hold on. I may have overspoken my time here, Your Honor. Could I ask for a forgiveness for that and cede a minute to my co-counsel? Yes, thank you. Thank you, Your Honor. In response to one of your questions, counsel pointed out that the evidence that would come in against Mr. Hoyos would be his prior criminal arrests. I don't think the...my memory is that the trial judge had excluded the arrest in Mexico and the conviction in Mexico concerned for torture being involved in the possible conviction. And then one of our uncertified issues was that, and counsel did not mention this, but I think the record is clear that possibly his post-arrest statement would have come in, and we believe that was an involuntary statement. He had made a statement. He had been Mirandized. He had asserted his right to counsel, and then two days later government investigators went and re-Mirandized him but did not take a waiver and then took a statement of some length, not very much length, but wherein Mr. Hoyos did make some inconsistent statements and he denied knowing the Magoons. So that is other evidence that possibly could have come in, and it shouldn't have come in because counsel made the rookie error not to insist on a ruling on the voluntariness of the statement in the face of a government offer not to use the statement in its case in chief. Thank you. Thank you. Well, we thank both sides for their argument in the case of Hoyos v. Davis is submitted and we're adjourned for this session. All rise.
judges: IKUTA, CHRISTEN, BUMATAY